UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
UNITED STATES OF AMERICA,

                                                                                     18-cr-259 (PKC)

        -against-                                            OPINION AND
                                                                          ORDER

MARKO STASIV,

                              Defendant.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

        This a motion for a new trial by defendant Marko Stasiv following his conviction at trial of conspiracy to commit wire fraud and bank fraud, substantive wire fraud, and aggravated identity theft. No challenge is made to the sufficiency of the evidence, the weight of the evidence, the evidentiary rulings, or the jury instructions. The motion is premised upon a juror's post-trial statements to members of the defense team that she "caved" to intimidation by other jurors. In the course of recounting the events surrounding the deliberations, the juror disclosed that jurors found a receipt issued to Stasiv inside a backpack that had been received into evidence. The receipt related to a deposit made into a commissary account at Rikers Island in 2014 (the "commissary receipt").

        The trial evidence convincingly demonstrated that Stasiv participated in a scheme to defraud banks and check cashing stores. The scheme participants created a seemingly legitimate (but in reality a sham) business in a designated location, posed as employees of the business, created bank accounts associated with the business, and cashed payroll checks at cash checking stores in ever-increasing amounts over the span of many weeks to build credibility with the stores. These checks would be drawn on the bank accounts associated with the sham

employers and would always clear until the final week of the scheme (the "bomb week"). During the bomb week, scheme participants would present larger checks at the check cashing stores, which the stores would cash and which would then bounce when deposited through the banking clearing system. The participants would split the profits, move on to the next designated location, and repeat the scheme with new victims. While executing the scheme, participants would stay in hotel rooms obtained by using the hotel rewards points of unsuspecting rewards program members without authorization. Stasiv was one of two team leaders who organized and directed other members of his team in the process of opening bank accounts and cashing checks at check cashing stores.

Until about one month before trial, Stasiv was represented by CJA counsel and, with the permission of the Court, a second associate counsel. The month before trial, Stasiv expressed a desire and intent to represent himself. After conducting a hearing consistent with Faretta v. California, 422 U.S. 806 (1975), the Court concluded that his decision to forgo counsel and to represent himself was knowing, intelligent, and voluntary. His CJA counsel and associate counsel were continued as standby counsel and were present throughout the trial.

The trial began on May 6, 2019 and after five days of testimony, summations, and charge, the jury retired to deliberate. The next day, the jury returned a verdict of guilty on all three counts. When the jury returned its verdict, the Court polled the jurors and each juror individually confirmed that the verdict read aloud was his or her verdict.

JUROR 10 EXPRESSES REGRET

After the jury was discharged, Stasiv's two standby attorneys exited the courtroom and encountered Juror 10 in the hallway. (Stabile Decl. ¶ 6). The juror appeared distraught and "indicated that she regretted her verdict and had 'caved' during deliberations after

she fought the other eleven jurors all day." (Id. ¶ 7). The associate counsel gave Juror 10 her business card. (Id. ¶ 8). On May 17, two days after the verdict was returned, associate counsel received an email from Juror 10 that read in part:

> I feel that I have made a terrible mistake in caving to juror and court pressure, despite my doubts pertaining to the prosecution, the way the jury approached deliberation, the disconnect between the judge's instructions and the verdict sheet, and in not knowing fully my rights, without repercussion (?) to vote Not Guilty as a juror regardless of the court instructions provided.

(Id., Ex. A).

The next day, Juror 10 met with both lead and associate counsel at lead counsel's office. (Id. ¶¶ 9-10). Lead counsel states that Juror 10 "was emotional and continued to express her regret at the verdict and that she was the lone holdout juror by the end of the deliberations." (Id.). At the meeting, Juror 10 handed counsel a four-page single-space document recounting the course of events in the jury room. (Id., Ex. B). Much of the document addresses matters that are not relevant or only marginally relevant to the present motion, such as what Juror 10 considered to be shortcomings in the evidence, e.g., "[Special Agent] Bruce Turpin's testimony (why didn't he answer the cross-examination question about his volunteering to be on the case)." (Id.). Also irrelevant was Juror 10's view that there existed a "discrepancy" between the Court's instructions and the verdict sheet, which she described as "misleading and opaque," and that the Court failed to instruct her of "my right to vote Not Guilty, even if I couldn't prove my doubt to be reasonable to fellow jurors, and even if a lot of that doubt stemmed from the instructions, that we were told so many times that we had to follow exactly." (Id.). Neither standby counsel nor defendant assert error in the Court's instructions or the verdict sheet, and no error is apparent to the Court after reviewing Juror 10's comments.

The portion of her written submission that is germane to the present motion is her claim that "[n]earing 5 o'clock, one juror became red-faced and agitated . . . his frustration turn[ed] from rational dialogue to a demeaning, heated tone and expression.  I was standing across the table from him.  He was leaning so far forward in his chair that I thought he might jump up out of his chair.  That was about the time that I gave in to the pressures."  (Id.).

The Second Circuit has noted in dictum the policy considerations underlying the general rule prohibiting inquiry into the deliberative process of jurors for the purpose of impeaching a jury's verdict:

> [T]he sanctity of the jury room is among the basic tenets of our system of justice.  Inquiries into the thought processes underlying a verdict have long been viewed as dangerous intrusions into the deliberative process.  They undermine the finality of verdicts and invite fraud and abuse.  We thus prevent jurors from impeaching their verdict to guard the jury's special place in our democratic heritage.
>
> This practice, of course, requires the verdict to reflect the true intent of the jury.

Attridge v. Cencorp Div. of Dover Techs. Int'l, Inc., 836 F.2d 113, 114 (2d Cir. 1987).

Rule 606(b), Fed. R. Evid., provides that unless an enumerated exception applies, "[d]uring an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations . . . ."  See Advisory Committee Notes to Rule 606(b) ("The mental operations and emotional reactions of jurors in arriving at a given result would, if allowed as a subject of inquiry, place every verdict at the mercy of jurors and invite tampering and harassment.").

In Anderson v. Miller, 346 F.3d 315, 326–27 (2d Cir. 2003), the Second Circuit reviewed the denial of habeas relief from a state conviction and expressed the view in dictum that there is a constitutionally-based exception to the general prohibition on juror inquiries where

there are "credible allegations of threats of violence leveled by one juror [against] another."[1]  In Anderson, a juror asserted that the other jurors were "screaming at me they didn't want me to have the read backs.  They also told me I was not going home. . . . One juror was in my face trying to fight me [and] I was afraid. . . . During dinner they told me make sure that you say guilty."  Id. at 320.  Despite those facts, the Circuit nonetheless affirmed the district court's denial of habeas relief reasoning that "at most, [the complaining juror] felt [herself] to be under pressure, perhaps even under duress, to vote in favor of conviction.  But we do not find that a reasonable juror, standing in the shoes of [the complaining juror], would have thought herself to be facing a physical assault if she refused to vote for conviction."  Id. at 329.

The Anderson decision was consistent with United States v. Grieco, 261 F.2d 414, 414-15 (2d Cir. 1958) (per curiam), where the Circuit upheld the denial of the defendant's motion for a new trial.  In that case, a male juror's "shouting and yelling" at a female juror in "a very mean tone of voice," not letting her speak, and telling her she had no common sense caused the female juror to be "very nervous" to the point of "shaking," having "chills," feeling "sick," and being in "no condition to give that verdict."  (Id. at 414 n.1).  The Grieco court reasoned that the male juror's behavior did not warrant upsetting the verdict because it amounted only to "the blustering arrogance of [a] fellow [juror] that so agitated the [female] juror that, after she had later had time to reflect, she concluded that she had not voluntarily concurred in the verdict."  Id. at 414-15; accord Jacobson v. Henderson, 765 F.2d 12, 14 (2d Cir. 1985) (per curiam) (denying habeas relief from a state conviction in the face of an allegation that a juror "threw a chair at another, then 'broke down,' crying and claiming that he was a 'sick man[,]' . . . [while] the jury

---

[1] In discussing this exception, the Circuit approvingly quoted a hypothetical posed by the district judge: "So if you have twelve jurors and eleven pulled out a weapon and pointed collectively at the twelfth person's head and said vote guilty or we shoot, you would say that the federal court cannot inquire into that?  You don't seriously mean that?"  Id.

foreman 'refused' to notify the trial judge of these incidents although he was requested to do so by other jurors").

Accepting Juror 10's email and four-page narrative (Stabile Decl., Exs. A & B) as true and drawing all reasonable inferences in favor of Stasiv, there is nothing therein that would give a reasonable juror the impression that she "fac[ed] a physical assault if she refused to vote for conviction." See Anderson, 346 F.3d at 326–27.

Juror 10's detailed description of events during nearly all of the deliberation process reflects little out of the ordinary in the conduct of conscientious jurors. She describes that "[m]ost members of the jury methodically went through the instructions point by point, systemically [sic] finding and referring to evidence . . . and 'checking the boxes' to fulfill a guilty verdict on each." (Stabile Decl., Ex. B). Juror 10 expressed to her fellow jurors that she "needed an hour to go through all of the instructions and charges carefully and thoroughly, to fully understand what we would be convicting for if we returned guilty verdicts" and "wanted to go through all the evidence." (Id.). Juror 10 proceeded to do so "for about an hour." (Id.). She recounted that "[e]very time a juror found evidence in the files . . . pertaining to question 2 or 4, they would call me over and explain why they thought it was evidence to find the defendant guilty" and the other jurors "debated with me on my points and stance." (Id.). After 1 p.m. on the last day of deliberations, only a few jurors were still looking at exhibits ("evidence"). (Id.).

As previously quoted, Juror 10 recounted that "[n]earing 5 o'clock, one juror became red-faced and agitated, and I saw and felt his frustration turn from rational dialogue to a demeaning, heated tone and expression. I was standing across the table from him. He was leaning so far forward in his chair that I thought he might jump up out of his chair. That was about the time that I gave in to the pressures." (Id.). Notably, Juror 10 does not accuse this juror

of making any verbal threat, physical or otherwise, to her.  Nor does she state that the juror sought to have her change her vote.  His conduct was consistent with that of a person who exhibited signs of frustration and anger because the jury would have to return the next day for continued deliberations and might never reach a unanimous verdict.  The sum total of any arguably threatening behavior was the juror's act of leaning forward in his chair, while "red-faced and agitated."  Juror 10 states that she thought "he might jump up out of his chair" but, significantly, she was *standing* across the table from him while the offending juror was *seated* on the opposite side of the table.

Immediately after the interaction, Juror 10 had a period of reflection before committing to her vote.  After she expressed an intent to change her vote, "[a]t least 2 other jurors asked me if I was sure, and that I had to be sure.  I replied that one of the instructions was to listen to your fellow jurors, and that is what I would do."  (Id.).  She adds, upon reflection, that "I didn't stay sharp.  If I had stayed sharp, I would have asked the group to come back tomorrow, or asked the foreperson to let the judge know that I would not change my mind (or needed another day of deliberation)."  (Id.).  Notably, even with the benefit of after-the-fact reflection on her options, she did not see any need to advise the judge of the other juror's visible frustration and anger.

While Juror 10 subjectively may have "felt [herself] to be under pressure" to reach a unanimous decision before the end of the work day, the behavior she describes in detail (which is taken as truthful) does not rise to the level of a "credible allegation[] of threats of violence leveled by one juror [against] another."  See Anderson, 346 F.3d at 326–27.  Moreover, her decision to vote guilty was not rash.  She expressed an understanding that she was free to ask the foreperson to let the judge know that the jury was deadlocked or continuing deliberations the

next day. She additionally knew that she could have asked the foreperson to send a note to the judge advising the judge of the other juror's conduct. She was also advised of her right to send a note herself in the event that the foreperson declined to honor her request. (Tr. 1078). But Juror 10 did none of those things. After the verdict was taken, Juror 10 could have also advised the Court in response to the polling of the jury that she did not concur in the verdict. Yet, when asked in open court whether the verdict read was her verdict, she responded in the affirmative. Her undoubtedly sincere statement of regret does not provide a basis to set aside the verdict.

THE COMMISSARY RECEIPT

Stasiv also moves for a new trial based on the 2014 commissary receipt that was discovered by the jury during deliberations. The receipt was located inside a backpack that was marked and received into evidence and sent into the jury room during deliberations. Although there was ample opportunity for both parties to inspect the backpack, the presence of the receipt inside the backpack was unknown to any of the trial participants. Stasiv does not argue that the receipt did not remain present in the backpack at all times since the backpack left his possession. (See Tr. 872). Nor does he argue that the receipt's presence in the backpack when received into evidence was the result of anything other than inadvertence.

"It is well-settled that any extra-record information of which a juror becomes aware is presumed prejudicial." United States v. Greer, 285 F.3d 158, 173 (2d Cir. 2002) (citing Remmer v. United States, 347 U.S. 227, 229 (1954)). "This presumption, however, may be overcome by a showing that the extra-record information was harmless." Bibbins v. Dalsheim, 21 F.3d 13, 16 (2d Cir. 1994) (citation omitted) ("The touchstone of decision . . . is thus not the mere fact of infiltration of some molecules of extra-record matter . . . but the nature of what has been infiltrated and the probability of prejudice."). The prejudice inquiry is an objective one, in

which a court considers how knowledge of the the extra-record information would impact the verdict of a reasonable jury. See id. at 17.

As a threshold matter, Stasiv has not shown that the receipt is, indeed, extra-record evidence. The backpack was marked, offered and received into evidence as GX 1412A without objection. (Tr. 872). The record demonstrates that it was known to the Court, the parties, and the jury that the backpack contained an unspecified number of items that were not individually catalogued on the record. For example, Special Agent Bruce Turpin was asked "What are *some of the items* that are—that were inside that backpack?" (Tr. 879 (emphasis added)). He responded describing a Ukrainian driver's license, a permanent resident card, and two Ukrainian passports, all in Stasiv's name. (Id.). A reasonable person hearing the testimony would understand that the backpack admitted into evidence contained items in addition to those mentioned in testimony. The unmentioned receipt is not analytically different than, for example, meaningful markings or an inscription on a backpack that was offered and received without the conscious focus of one or both sides—the markings or inscription would nevertheless constitute evidence. The Court concludes that the backpack and its contents were received into evidence without objection and are not extra-record evidence.

Even though Stasiv has not shown the receipt to be extra-record evidence, the Court will proceed to analyze the issue as if it were. Stasiv suggests that the commissary receipt is akin to information reflecting a prior conviction and relies upon the principle that the "[e]rroneous admission of a defendant's prior conviction normally warrants a new trial . . . ." (Def. Br. at 10 (citing United States v. Figueroa, 618 F.2d 934, 944 (2d Cir. 1980))). The government argues that the receipt was harmless because it does not amount to evidence of a conviction of any person on any charge, but instead reflects only that a deposit was made in an

unidentified person's commissary account by an unidentified person four years before the charged conspiracy.

The Court concludes that the presence of the commissary receipt in the backpack caused no prejudice to Stasiv given the limited information on the face of the receipt and the overwhelming evidence of Stasiv's knowing participation in the check cashing scheme and the aggravated identity theft.  A description of the content of the receipt and the background to the admission of the backpack into evidence is necessary to an understanding of this issue.

The trial testimony revealed how the backpack containing the receipt came into the government's possession.  Stasiv and his check cashing team were under FBI surveillance on February 26, 2018, while they were running their scheme in the Los Angeles area.  (Tr. 143-44). The surveillance team observed three check cashers entering Stasiv's car and Stasiv carrying a blue hard-case folder, which was later found to contain documents relating to the incorporation of two sham employers and the creation of related bank accounts.  (Tr. 859-65).  The surveillance team also observed individual check cashers exiting Stasiv's car and entering check cashing stores and Stasiv driving from store to store.  (Tr. 865-72).  The team of check cashers visited 5 or 6 check cashing establishments that day.  (Id.).  The next day, Stasiv was arrested and a backpack was seized from a hotel room occupied by Stasiv and a co-conspirator.  (Id.).

At the time of Stasiv's arraignment, personal items of Stasiv's were removed from the backpack and returned to him via his then attorney.  (Turpin Decl. ¶ 7).  Later, the backpack and its remaining contents were shown to Stasiv's then defense counsel in the office of the United States Attorney.  (Turpin Decl. ¶ 8).  The backpack was offered and received into evidence at trial as GX 1412.  Certain items inside the backpack were separately marked and received as GX 1412A-C.

After the jury was charged and began deliberating, all parties were given the opportunity to inspect the actual exhibits that would be brought into the jury room. Standby counsel reviewed some portion of the exhibits. (Id. ¶ 10). No objection was voiced to any of the exhibits going into the jury room. Special Agent Bruce Turpin states that he was unaware that the receipt was in the backpack. (Id. ¶ 11). The defendant does not argue that the presence of the receipt in the backpack was the result of anything other than inadvertence. (Def. Reply at 2).

In Juror 10's post-trial written statement (Stabile Decl., Ex. B), she states "[t]hat there were random receipts from 2014 in one of the backpacks—who carries around a few receipts from 4 years ago on cross-country trips?" In her May 18, 2019 meeting with standby counsel, she referred to it as the "Rikers Island" receipt. (Id. ¶ 11). On May 28, the government located a printed receipt in the backpack that reads in full as follows:

```
03/30/14                                    08:28
THE CITY OF NEW YORK
DEPARTMENT OF CORRECTION

RICC

STASIV, MARKO
ID#4411402909

DEPOSIT OF FUNDS

VISIT DEPOSIT

RECEIVED AS CASH

             AMOUNT      REFERENCE#
             200.00      1289677965
TOTAL        200.00      ---------------

Spending Limit is $125 per week
```

(Stabile Decl. ¶ 11, Ex. C).

"RICC" is an abbreviation for Rikers Island Central Cashier.  (Gov't Br. at 18). Rikers Island Facilities are a collection of units or centers operated by the New York City Department of Correction for holding individuals accused of crimes or serving sentences equal to or less than one year.  (See https://www1.nyc.gov/site/doc/about/facilities.page (last visited Aug. 28, 2019)).  The receipt's reference to a "[s]pending limit" is consistent with the receipt being a record of a deposit into a commissary account for the benefit of an inmate.

The face of this receipt conveys very little meaningful or relevant information. Stasiv has offered no explanation of how the receipt came into his possession other than standby counsel's statement that Stasiv was incarcerated at Rikers Island "for several weeks in 2014, after he was arrested at JFK airport and awaiting extradition to North Carolina."  (Stabile Decl., ¶ 13).  The receipt itself, however, does not indicate who was held at Rikers Island, why this individual was held, for how long, or whether this individual was convicted of any crime.

The fact that Stasiv's name appears on the receipt and there is an "ID#" underneath his name does not mean that he was the recipient rather than the donor of the commissary deposit.  Notably, there is no indication that the identification number is an inmate or prisoner identification number.  The number could plausibly be an identifier for the specific deposit transaction or the person who made the deposit.  The receipt bears the words "VISIT DEPOSIT," suggesting that this deposit was made while someone was visiting an inmate.  Stasiv could very plausibly have been the visitor who made a "VISIT DEPOSIT" into a commissary account for the benefit of a prisoner and received a receipt in return for the deposit.  In this scenario, Stasiv's possession of the receipt years later would have a plausible explanation.  The other possibility is that a visitor made a deposit into Stasiv's commissary account and then gave Stasiv the receipt, which he held onto for the next four years.

The evidence, apart from the commissary receipt, was overwhelming in demonstrating Stasiv's guilt on all three counts. It included videos and photographs of Stasiv standing next to a co-conspirator while the co-conspirator was opening a bank account for a sham entity. (Tr. 104-06, 124-7, GX 211A, GX 212B-C). It also included testimony by cooperator Kyrylo Samoilenko, who testified that Stasiv worked the scheme with him in New York, Pennsylvania, Florida and Maryland. (Tr. 357-59, 387-95, 399-400, 505-512, 513-30, 530-45, 549-54). After a falling out with Samoilenko, Stasiv continued as a team leader working the scheme in Georgia, (Tr. 205-09, 734-35, GX 103B), Texas, (Tr. 620-21, GX 303-C), and Los Angeles, (Tr. 857-61, 879-81).

The evidence also included thousands of text messages spanning around 100 different dates between Stasiv and Samoilenko discussing the scheme, (GX 700-001-700-105), and an audio recording of a meeting between the two, (Tr. 719-35, GX 703, 703-T). The authenticity of the text messages and recording was never challenged at trial. Also admitted was cell site evidence confirming Stasiv's presence when and where the scheme was operating. (Tr. 933, 941-45, GX 1203, 1203A). Additionally, managers from two banks confirmed their interactions with Stasiv, during which Stasiv took actions and made representations to further the scheme. (Tr. 83-111, 112-131). Stasiv was also observed by FBI agents driving check cashing members of the scheme to banks and check cashing establishments and arrested by FBI as three check cashers were entering his vehicle. (Tr. 145-49, 861-71). Thirteen checks from sham companies were found in Stasiv's car. (GX 1402G). The backpack taken from Stasiv's hotel room contained an 8-page list of check cashing stores, (Tr. 878-81, GX 1412C), and a receipt from a bank for the purchase of 500 blank checks in the name of a sham company, (GX 1412B).

The aggravated identity theft charge was based on the unauthorized use of hotel rewards points to obtain hotel accommodations while executing the check cashing scheme in various locations. This charge was established by testimony from Samoilenko, (Tr. 420-34, 483-88), text messages between Samoilenko and Stasiv, (GX 700-043, 700-077, 700-102), hotel records documenting Stasiv's unauthorized use of the hotel rewards points of others, (GX 900A, 902, 903, 910-01, 910-02, 910-04, 910-05, 910-79, 910-80, 924, 925), wire transfer records between Stasiv and his associates who facilitated the rewards points transactions, (GX 1100, 1100A-C), and testimony by the victims whose rewards points were used, (Tr. 460-68, 698-708).

The Court has considered the entirety of the properly admitted evidence before the jury in comparison to the purportedly extrinsic and inadmissible evidence, including its nature and content, and concludes that there was no prejudice to Stasiv. The extra-record information in this context was harmless in its effect on the jury. See Bibbins, 21 F.3d at 17–18 (denying habeas relief, reasoning that the strength of the prosecution's case precluded the possibility that the extra-record information "would have a substantial and injurious effect on the verdict of a reasonable jury"); United States v. Weiss, 752 F.2d 777, 783 (2d Cir. 1985) ("The trial court should assess the 'possibility of prejudice' by reviewing the entire record, analyzing the substance of the extrinsic evidence, and comparing it to that information of which the jurors were properly aware.").

Additionally, no prong of Stasiv's motion requires an evidentiary hearing. With regard to the alleged juror-on-juror coercion, the Court has accepted Juror 10's detailed account as true, drawing every reasonable inference in Stasiv's favor. With regard to the receipt, the Second Circuit has made plain that the standard for evaluating extra-record evidence is an objective one not dependent upon the views of the individual jurors in the case. See Bibbins, 21

F.3d at 17–18 ("Where an extraneous influence is shown, the court must apply an objective test, assessing for itself the likelihood that the influence would affect a typical juror." (quoting Miller v. United States, 403 F.2d 77, 83 n.11 (2d Cir. 1968))).

CONCLUSION

        Defendant Stasiv's motion, pursuant to Rule 33, Fed. R. Crim. P., for a new trial (Doc. 171) is DENIED.

        SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated: New York, New York
       August 29, 2019